Argued June 11, 1958, affirmed February 25, petition for rehearing
denied April 15, petition to correct opinion
denied April 29, 1959

# MOORE MILL & LUMBER COMPANY *v.* FOSTER

336 P. 2d 39
337 P. 2d 810

*Thomas H. Tongue, III*, Portland, argued the cause for appellant. With him on the brief were William E. Walsh and Robert F. Harrington, Coos Bay.

*Norman J. Wiener*, Portland, argued the cause for respondent. With him on the brief were Frederic H. Starkweather, Jr., Gold Beach, and King, Miller, Anderson, Nash & Yerke, Portland.

Before PERRY*, Chief Justice, and ROSSMAN, LUSK, WARNER, MCALLISTER** and SLOAN, Justices.

ROSSMAN, J.

These are two appeals by the defendant, consolidated through stipulation of the parties, from two judgments rendered by the circuit court in favor of the plaintiff in condemnation actions. The actions were instituted pursuant to ORS 376.505 through 376.540, and the only difference between them is the identity of the real property they affect. Each of the two challenged judgments appropriated to the plaintiff an easement, 80 feet wide, over land owned by the defendant, for the right of way for a logging road which the plaintiff wishes to construct. The two roads, if built, will start at the same point and each will be an extension, or fork, of a longer road known as Willow Creek road which is owned by the plaintiff and which now terminates at the point where the two extensions will begin. Each fork will be about a mile long. If the extensions are constructed, Willow Creek road will enter at two places a body of timberland 5500 acres in extent recently acquired by the plaintiff. One of the judgments required the plaintiff to pay for the easement in that action $2,700 and the other required the payment of $2,300. In one of the cases the area subject to the easement is approximately 18.7 acres and in the other 20.1 acres. The appropriated land lies in western Curry county and is principally suitable for forestation and grazing. The plaintiff is a private corporation which was formed under the laws of this state. Its mills require 70 million feet of logs annually, a part of which is purchased in the market. After the

---

* Chief Justice when the cause was argued.
** Chief Justice when this decision was rendered.

issue of necessity had been resolved in favor of the plaintiff by the trial judge, the question as to the amounts payable to the defendant was determined by the verdicts of the juries. The defendant-appellant presents thirteen assignments of error.

The first assignment of error reads:

"The Court erred in finding and holding that there exists a 'necessity' for the appropriation by plaintiff of the proposed rights of way for a logging truck road over the defendant's lands."

The fourth assignment of error, which we will consider concurrently with the first, reads as follows:

"The Court erred in denying the following motion by defendant:

'We . . . request that a jury trial be allowed in these cases on all issues, including the issue of necessity.'

to which the Court replied:

'Let that motion be overruled.' "

A determination of the assignments of error just quoted requires us to consider facts which we will now set forth briefly. The plaintiff has a mill in Bandon and an affiliated mill in Empire. It owns timberlands in the general vicinity of the two mills. In August, 1956, it acquired an additional tract of timberland which, when combined with contiguous tracts already owned by it, formed a block of 5500 acres containing 100 million feet or more of standing timber. The plaintiff's desire to secure from the tract as much as 50 million feet annually and bring the logs to its Bandon mill resulted, on December 26, 1956, in the institution of the two actions under consideration. Each action sought, as we have already indicated, an easement across parts of land owned by the defendant so that

the plaintiff can construct two extensions, or branches, of the Willow Creek road and thereby reach the timberland we have mentioned. The tract is about 28½ miles southeast of Bandon if a route is taken consisting of (a) either of the two proposed extensions, (b) the Willow Creek road, and (c) U. S. Highway 101 from the point where the Willow Creek road connects with it. U. S. Highway 101 runs along the coast north and south through Bandon. The tract comprising 5500 acres lies in a mountainous area in Curry county, approximately seven miles or more east of U. S. Highway 101. As one leaves Highway 101 in the general vicinity of the 5500-acre tract and heads east foothills are encountered. A witness, in describing the 5500-acre tract, stated that it "lies in more or less of a cup shape," that is, its perimeter is marked by a series of ridges. In or near the northwest corner of the tract the ridge consists in part of an elevation known as Edson Butte, 2,786 feet high. The Willow Creek road reaches a summit of 2,200 feet in that vicinity. Toward the southwest corner of the tract the ridge is an elevation known as Elephant Rock, 1,512 feet high. The Plum Tree road in that vicinity, which we will later describe, reaches a height of 1,200 feet. Logs secured from the 5500-acre tract, in making their way to Bandon, will have to use in part U. S. Highway 101 which, as we have said, is seven miles or more west of the 5500-acre tract. Accordingly, the log trucks will have to cross the ridge in the northwest or southwest corners of the 5500-acre tract.

In its northwest corner, the 5500-acre tract abuts upon land owned by the defendant located in Sections 22, 23, 26 and 27 [T.31S., R.14W., W.M.] which lie between the 5500-acre tract and the eastern end of Willow Creek road. The latter, eight and a half miles long,

was constructed by the plaintiff for logging purposes. It is a private road and the plaintiff is its owner. The road begins on U. S. Highway 101 about a half mile north of the community known as Denmark, and, after pursuing a southeasterly direction for four and a half miles, takes a course substantially east for the remaining four miles of its length. Its eastern end is in the west line of Section 22, which we have stated is owned by the defendant. Thus it ends a mile or so west of the nearest part of the 5500-acre tract. The plaintiff seeks in these two condemnation proceedings easements which will enable it to extend the Willow Creek road in two forks across parts of Section 22, 23, 26 and 27. If the two access roads are built, the plaintiff will be able to bring the logs which the 5500 acres will produce down the Willow Creek road into Highway 101 and on to its Bandon mill.

Since the defendant challenges the Willow Creek road as suitable to the plaintiff's purpose, we will take notice of the evidence which discloses the road's fitness.

The Willow Creek road is a mainline road and was described by the plaintiff's superintendent, Walter Miller, as an "all-weather road." He added, "We have logged the year round" upon it. The same witness declared that the road has "adequate turnouts and passing areas." Apparently it was well constructed. The plaintiff plans to haul upon it to Bandon from the 5500-acre tract 100 loads of logs per day. For that purpose an all-weather road, according to the plaintiff's evidence, is essential. The Willow Creek road has an adverse grade of about six to seven per cent at one place, but a witness declared, "Six to seven per cent adverse isn't very much to a truck now days. * * * Nothing to be weighed heavily." Another witness,

William Ruhmann, forest manager for Coos Bay Timber Company, testified that the Willow Creek road has "nothing in excess of eight per cent" adverse grade. He added that six per cent "is considered a reasonable grade." More than that percentage adds materially to the cost of operation.

The Willow Creek road, for large part, lies upon high ground and is, therefore, comparatively free of the drainage problem which the witnesses declared is a difficult one in the rainy region with which this case is concerned. The road passes through a place about a half mile in length in which slides have occurred. Since the road is privately owned, it is not subject to statutes and regulations which govern speed and the weight of the load. Being a private road, the log truck drivers who use it do not encounter the hazards which confront log truck drivers upon public roads. One of the witnesses, who stated that the chief advantage of the Willow Creek road is the fact that it is a private thoroughfare, explained, "All lumber companies look for a private route to keep out of the way of the public."

The two extensions to the Willow Creek road which the plaintiff seeks to construct were identified as the upper road and the lower road. The upper road, as staked upon the ground, will have a maximum grade of six and a half per cent for a distance of a quarter of a mile. The grade of the contemplated lower road was not mentioned by the witnesses.

We will now review the evidence which describes the road that the defendant says the plaintiff should use. It is the county [public] highway, known as the Sixes River road, about four miles south of the Willow Creek road and extending easterly from Highway 101. It is an all-weather road. Roughly, it parallels the

Willow Creek road, although for a substantial part of its length it has more curves than the Willow Creek road. Some of its curves are sharp, and it is very narrow in places. The eastern terminus of the Sixes River road is in Powers, east of the 5500-acre tract. The Sixes River road does not enter the 5500-acre tract but lies south of it one to three miles, dependent upon the course of the road at a particular point and the irregular shape of the 5500-acre tract. In order to haul logs from the 5500-acre tract to Bandon by way of the Sixes River road, it will be necessary for the plaintiff to have a road from the tract to the Sixes River road. If an access road of that kind is acquired and the logs are taken down the Sixes River road to Highway 101 and then on to Bandon, the distance will be about 37 miles, or approximately eight miles more than if the Willow Creek road were used.

The testimony given by the aforementioned Walter Miller presents the following impression of the Sixes River road:

"* * * the Sixes River road is a county road subject to shut-downs, slides; there are adverses on the county road, and it is dangerous. There are people living in that area that travel up and down the road.

* * *

"Danger. The second one, it is longer and a congested road and it takes truckers backing up a great deal of time; it is a narrow road and a much longer haul; the eight-mile difference in hauling and the time—takes more trucks to operate to remove the same amount of timber. And the fact that, your eight-mile difference, which would make sixteen miles round trip, but I think the rate could not be computed the same as you would on your Willow Creek road, where you have adequate turn-outs and passing areas.

\* \* \*

"The Sixes River road has numerous narrow spots, passes through gorges, and it has slide areas on the main road itself and also it is subject to washouts by the river, which we are not confronted with on the Willow Creek road."

Manford Martin, the plaintiff's forester, testified that the Sixes River road has slide areas and

"you can't tell in the wintertime whether you are going to be able to get back up with a truck or not. In fact, last winter three or four different times, three times in particular, we were unable to get up the Sixes River to work on account of slides and a lot of times you couldn't even drive a Jeep over it."

The witness, after acknowledging that the Willow Creek road passes through a slide area, swore that in the preceding winter no slide had occurred along its length, and then, referring to the Sixes River road, said that "there are ten times as many [slide areas] on the Sixes River road."

According to the plaintiff's witnesses, whose testimony does not appear to be challenged, the operation of the log trucks, which the plaintiff proposes to employ in removing logs from the 5500-acre tract, would overtax the road's capacity and constitute a serious source of danger. School busses use the Sixes River road.

The Sixes River road has adverse grades, but they are of less consequence than those on the Willow Creek road. However, the testimony of Mr. Martin, aforementioned, indicates that the effect of a rising grade is ameliorated if the road thereby achieves higher ground where superior drainage is gained. He swore that the Willow Creek road gained good drainage in that manner.

We have mentioned the fact that the Sixes River road approaches no nearer than a mile to the 5500-acre tract. The plaintiff possesses the right to log some of the land between the 5500-acre tract and the Sixes River road. In its operations upon those intervening tracts, it built four access roads known as the Plum Tree road, Elephant Rock road, Mast road and Palacea Creek road, which lead into those tracts from the Sixes River road. Of the four only the Plum Tree road enters the 5500-acre tract. It is the farthest west of the four. The Elephant Rock road is two miles farther east and the other two are still farther east. All four were described by witnesses as "summer" roads, that is, unsuited for substantial use in the rainy season. The Plum Tree road received more mention during the trial than the other three as a possible route for logs taken from the 5500-acre tract to Bandon. According to Miller, it

> "is a crooked, steep road built on sliding land and through some swamp. * * * It is a very narrow road; no turn-outs—quite a distance between turn-outs."

Ruhmann testified that the Plum Tree road

> "wasn't built with the idea of a modern conception of logging. I doubt that the road was built for logging purposes in the first place."

Both he and Miller agreed that it is inadequate to handle much traffic. The Elephant Rock road is, in part, upon a slide area, and a witness described it as unsuitable for handling the logs which the 5500-acre tract will produce. The other two roads received little attention by the witnesses. The plaintiff has used none of the four roads for bringing logs from the 5500-acre tract to the market. The defendant apparently agrees that the Plum Tree road cannot be converted

into a suitable road where it now lies. To relocate it and place it in satisfactory condition will require an expenditure of $45,000.

Wayne Spencer, the plaintiff's forester, was called to the witness stand by the defendant as an adverse witness. He expressed the belief that "it would be feasible to move logs" from the 5500-acre tract by the Plum Tree and Sixes River route, but that it would not be "as advantageous from the standpoint of expense and congestion and safety to do so." The witnesses so far mentioned had been familiar with the area for many years.

Norman W. Porteous, a consultant forester and witness for the defendant, was unacquainted with the two roads until a week before he gave his testimony. He based in part the opinions which he offered upon computation of costs, grades and distances made by others which did not become a part of the record. Mr. Porteous expressed the belief that "the proper way to log" the 5500-acre tract was by the Sixes River road. According to him, the use of that route "would be both feasible and practical," but added, "I mean on the assumption that, which I have made, that the road would be fixed up." By the term "would be fixed up" Mr. Porteous meant that the county would improve the road and enable it to carry the plaintiff's volume of business, or authorize the plaintiff to make the needed alterations and improvements. The witness possibly had in mind ORS 376.305 to 376.390. Under an assumption that the Sixes River road would be rendered adequate, Mr. Porteous estimated that the cost of bringing logs from the 5500-acre tract to Bandon would be approximately the same whether the Sixes River or Willow Creek road were used. We quote the following from his testimony:

"Q Assuming that the county wouldn't enter

into such a county road contract and that the Sixes River road wouldn't be improved, is it still your judgment the most practical and feasible route for the removal of timber from the 5500 acres is out the Sixes River Road?

"A No."

The record contains no indication as to whether or not the county will improve or authorize the plaintiff to improve the Sixes River road. Mr. Porteous acknowledged that the private ownership of a road which is used for log hauling is an important factor in its favor. He said that in the instant case he did not give that circumstance "too much weight."

After the witnesses had given their descriptions of the two roads of which we have taken note, they expressed views as to whether or not it is essential that the plaintiff acquire the easements which it seeks.

Walter Miller, aforementioned, testified that the Willow Creek road and its two proposed extensions constitute the most feasible route to bring to Bandon the logs from the 5500-acre tract. He swore that the use of that road would effect for the plaintiff a saving of $2.00 per thousand, or a total of $200,000, if the tract yields 100 million feet. According to his uncontradicted testimony, the cost of hauling logs constitutes "a third of your" logging expense, and an item of $2.00 or $3.00 a thousand is "definitely significant. In expressing a belief that the Willow Creek road is the feasible route for bringing to Bandon the logs obtained from the 5500-acre tract, Miller declared, "There is just no comparison." The following is a succinct statement of the basis of his belief: (1) the saving of $200,000; (2) the fact that the Willow Creek road is eight and a half miles shorter and would require the use of fewer trucks and men; (3) since the

public cannot use the Willow Creek road, operation upon it is less hazardous; (4) the Willow Creek road has a better surface, fewer curves and is largely free of slides; (5) since the Willow Creek road is private, it is free from publicly imposed speed and load regulations.

William Ruhmann, whom we have mentioned, testified: "The Willow Creek road is the most feasible." He deemed it the most economical and practical as well as the most feasible. He gave as his reasons: (1) it is a private road, "that is the chief reason"; (2) if the Sixes River road were used it "would be overloaded"; and (3) the expense of operation upon the Willow Creek road would be $2.00 per thousand less than on the Sixes River road.

Manford Martin, aforementioned, expressed the belief that the Willow Creek road is the most feasible, practical and economical route for the removal of the logs from the 5500-acre tract to Bandon. Preceding paragraphs state the bases of his opinion. The witness testified that "it is possible but not feasible" to bring the logs over the Sixes River road. He explained that the drainage of the entire area is southerly toward the Sixes River with the resulting slides and unstable soil conditions that he and other witnesses had mentioned.

We have already taken note of the opinion expressed by Porteous. We have left unmentioned witnesses who supplied data that other witnesses employed.

The foregoing will suffice as a review of the evidence. The transcript of the trial proceedings covers 275 pages and is accompanied by numerous exhibits. Obviously, the foregoing review omits details.

After the witnesses had given the testimony reviewed in the preceding paragraphs, the trial judge ruled:

"There appears to be reasonable necessity for condemning this land. Let the holding of the Court be that, a finding of fact there is reasonable necessity for the plaintiff to take this land."

Still later the trial judge entered findings of fact from which the following is taken:

"That there exists a necessity for the appropriation by plaintiff of an easement of a right of way for a logging truck road, road or way over that part of the lands owned by defendant hereinabove particularly described to enable plaintiff to transport said raw products of the forest to market.

"That the use to which plaintiff seeks to apply the strip of land over and across the lands of defendant is a public use under the Constitution and laws of the State of Oregon, and that the taking of said easement in said strip of land is necessary to such use."

The defendant, in challenging the finding made by the trial judge, argues:

"By the constitutional amendment of 1920 and the statute adopted in 1921, following court decisions holding previous statutes for condemnation of private logging roads to be unconstitutional, it was intended and provided that condemnation of lands for private logging roads should be permitted only where such roads were a 'necessity' in the sense that the timber owner was 'bottled up' and had no other access for removal of logs to market."

In support of his contention that a jury, and not the trial judge, should have determined the issue of necessity, the defendant states:

"The Oregon Constitution, Article I, Sec. 17, provides:

'In all civil cases the right of trial by jury shall remain inviolate'

and in 1910 the people of Oregon further provided by constitutional amendment to Article VII, Sec. 3, that:

> 'In actions at law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . .' "

The defendant concedes that

> "* * * it is the established rule in Oregon that in condemnation proceedings by an agency of the state for a purely public use—such as a proceeding by the State Highway Commission to condemn land for a public highway—the question of necessity is to be determined by the court * * *."

Article I, § 18, Constitution of Oregon, as amended in 1920, reads as follows:

> "Private property shall not be taken for public use, nor the particular services of any man demanded without just compensation; nor except in the case of the state, without such compensation first assessed and tendered; provided, that the use of all roads and ways necessary to promote the transportation of the raw products of mine or farm or forest is necessary to the development and welfare of the state and is declared a public use." Oregon Laws 1921, p. 5.

In 1924 section 18 was amended again so as to add waterways to the facilities for which condemnation could be conducted.

Before the 1920 amendment was made to Art I, § 18, *Anderson v. Smith-Powers Logging Company*, 71 Or 276, 139 P 736, had held invalid a statute which authorized the taking of private property for a private logging road. The decision ruled that taking by compulsory purchase is permissible only for a public use. After making its pronouncement the decision declared:

> "If conditions in this state have so changed as to make it necessary to have a change in our Con-

stitution, relating to the taking of property for private uses, the proper remedy lies in amending the Constitution, as has been done in several states."

Then came the 1920 amendment. The 1924 amendment altered the 1920 phraseology by making it read:

"* * * the use of all roads, ways and waterways necessary to promote the transportation of the raw products of mine or farm or forest or water for beneficial use or drainage is necessary to the development and welfare of the state * * *."

Following adoption of the 1920 amendment, Oregon Laws 1921, ch 357, was enacted, the title of which follows:

"Relating to the condemnation of lands for logging railways, roads or ways, necessary or convenient to promote the transportation or removal of raw products of the forest."

Section 2 of the act, as it appears in ORS 376.510, provides:

"Any such person, firm or corporation has the right to acquire and own all lands reasonably necessary for the logging road or way to promote the transportation of logs or the raw products of the forests. If such person, firm or corporation is unable to agree with the owners of the land over which the logging railroad is necessary, as to the amount of compensation to be paid therefor, such person, firm or corporation has the right to condemn so much of the land necessary for the logging railroad, road or ways as may be necessary for the use thereof, and may maintain the suit for condemnation in the circuit court of the county wherein the lands are located. No land shall be taken until compensation has been assessed and tendered."

*Flora Logging Co. v. Boeing,* 43 F2d 145, sustained the validity of the act just quoted against a charge that it violated the due process clause of the federal

constitution. *Coos Bay Logging Co. v. Barclay*, 159 Or 272, 79 P2d 672, recognized the act as a valid exercise of the power of eminent domain. See, also, *Barkley v. Gibbs*, 180 Or 647, 178 P2d 918. The validity of the act was again recognized in *Oregon Mesabi Corporation v. C. D. Johnson Lumber Corporation*, 166 F2d 997.

We now proceed directly to the fourth assignment of error, which it will be recalled is based upon a contention that the issue of necessity should have been determined by the jury and not by the judge. In the consideration of that contention we take note that the defendant in the excerpt of his brief which we quoted acknowledges that in condemnation proceedings conducted by one of Oregon's agencies the question of necessity is determined by the court before the jury is impaneled.

Accordingly, the defendant grants that if the state sought by compulsory purchase to take for state highways the two strips involved in these appeals, the issue of necessity would be determined by the judge before a jury was impaneled. The reason why the state could have taken the strips for highway purposes is that (a) the use of land for public thoroughfares is deemed "a public use" as that term is employed in Art. I, § 18, and (b) privately owned property can generally be taken by the state under eminent domain for "a public use" provided that necessity is established and the demands of due process of law are met. Article I, § 18, as we have seen, permits the right of way for a logging road to be acquired by a private party through the power of eminent domain and thereby places a logging road in the same category as a public thoroughfare so far as the element of public use affects the case.

When the Highway Commission seeks to establish

a highway it is not favored by a constitutional provision declaring that the thoroughfare which it plans to build will represent "a public use." *State ex rel v. Hawk et al*, 105 Or 319, 208 P 709, says:

> "The question: What is a public use? is always one of law. Deference will be paid to the legislative judgment as expressed in enactments providing for an appropriation of property, but it will not be conclusive."

See to like effect *City of Eugene v. Johnson*, 183 Or 421, 192 P2d 251. Since the acquisition of rights of way for public highways was deemed from pioneer days a proper application of the power of eminent domain, the status of such a thoroughfare as a "public use" is free from doubt. But, unlike a logging road, a public thoroughfare has no constitutional provision such as Art I, § 18, which establishes its status as "a public use." Accordingly, in proceedings of this kind a logging road cannot be cast into an inferior role merely because it is not a state owned thoroughfare. Neither a state highway nor a logging road can be established unless a necessity for it is shown, but we will defer that phase of the case for a moment.

The state cannot construct all of the improvements which will constitute "a public use" and, therefore, invests occasionally a private party with the power of eminent domain. When it does so, the expropriated land is no less devoted to "a public use" than if the state had been the condemnor. The defendant concedes, as we have seen, that the established practice of this state entrusts the judge, and not the jury, with the determination of the issue of necessity if the state or one of its agencies is the condemnor. Article I, § 17, says "In all civil cases the right of trial by jury shall remain inviolate." That provision makes no dis-

tinction between cases of this character dependent upon whether the condemnor is the state or a private party. Jury trial of the issue of necessity is denied, not because the state is the plaintiff, but because, as we shall presently see, the proceeding was not within the class of cases tried by juries when the constitution was adopted.

If the defendant's contention that the jury, and not the judge, must determine the issue of necessity in cases in which a private party is the condemnor, this court will have to resolve in his favor one or both of the following propositions:

(1) Eminent domain proceedings are within the purview of Art I, § 17, which says "In all civil cases the right of trial by jury shall remain inviolate" or within amended Art VII, § 3, which is to similar effect.

(2) Some statute, which we will have to seek, requires that the issue of necessity shall be tried by a jury.

The constitutional provisions upon which the defendant depends are Art I, § 17, and amended Art VII, § 3. He cites no statute which directs that the issue of necessity shall be determined by a jury. Before considering the constitutional provisions and possible statutes we will give attention to *Application of Barton*, 111 Or 111, 225 P 322, from which the defendant quotes. That case was not governed by the statute which controls the case at bar but by ORS 376.105 to 376.150 which authorize the establishment by the county court of the minor thoroughfares that are sometimes called gateways or ways of necessity. The procedure for the establishment of those roads is materially different from that whereby a right of way for a logging road may be expropriated. The

legislation which controlled the Barton case provided for an appeal to the circuit court from an order of the county court which confirmed a report of road viewers and created a road, but did not outline the procedure which should govern the appeal. In the Barton case, a jury was impaneled upon appeal. In this court no question was raised as to whether or not a statute or constitutional provision authorized the use of the jury. The part of the decision which the defendant mentions merely held that an instruction, challenged by the appellant, correctly stated the law.

■■ We come now to Art I, § 17, and amended Art VII, § 3. This court, like others, has recognized that constitutional provisions such as those just cited assure trial by jury in the classes of cases wherein the right was customary at the time the constitution was adopted but do not extend it into other areas. An early decision to that effect is *Tribou & McPhee v. Strowbridge*, 7 Or 156. "Trial by jury shall remain inviolate" does not expand the classes of cases in which jury trial is available, as was held in that case, but merely preserves it as it was when the constitution was adopted. *Dean v. The Willamette Bridge Co.*, 22 Or 167, 29 P 440, reiterated the views expressed in the Tribou case. Proceedings in eminent domain are not common law actions in which jury trial was employed at common law. *Crane v. Hahlo*, 258 US 142, 42 S Ct 214, 66 L ed 514, 50 CJS, Juries, p 767, § 60, and 18 Am Jur, Eminent Domain, p 979, § 337.

*City of Eugene v. Johnson*, 183 Or 421, 192 P2d 251, took note that the right of eminent domain has been entrusted by legislative action, not only to subdivisions of the state, but also to "private corporations devoted to uses" which are public in character. The decision held:

"The necessity for the taking of property is a question of law for the court and not one of fact to be decided by the jury, and, if it is made an issue, it should be settled by the court before the jury is impaneled."

The early cases of *Kendall v. Post*, 8 Or 141, and *Branson v. Gee*, 25 Or 462, 36 P 527, show that the constitutional provision for trial by jury does not extend to eminent domain proceedings. Those decisions ruled that the legislature is free to entrust the trial of the issues in eminent domain cases to any impartial tribunal, provided that the demands of due process of law, such as notice to the owner and an opportunity to be heard, are respected. The Branson decision said: "A court or judge, with or without a jury, is an impartial tribunal." It continued:

"* * * In the case at bar the county court— composed of the judge and county commissioners— is the tribunal authorized by law to determine and assess the damages, and, when engaged in the transaction of such business, exercises judicial functions, and must be regarded as an impartial tribunal."

It took note that the Kendall decision held:

"* * * a party aggrieved by the acts of a supervisor who had taken stone from his land to repair the highway, must resort for redress to the county court while transacting county business, to determine and assess his damages, and that the statute was not unconstitutional because it authorized such court to assess the damages without a trial by jury. * * *"

In the recent case of *Port of Umatilla v. Richmond*, 212 Or 596, 321 P2d 338, we said:

"When a defendant is entitled to a jury trial in a condemnation action the function of the jury

is to decide only the amount of damages to be paid, or incidentally to pass upon the ownership of the land in so far as that may affect the right to compensation. * * *"

Shortly, that statement was made more pointed by the following:

"We deem it firmly established that whether a proposed taking is for a public use is a question for the court and not for a jury, even in a jury trial."

We are satisfied that the constitutional provisions previously quoted do not embrace eminent domain proceedings. They merely preserve that method of trial for the classes of cases in which it was employed prior to the adoption of the constitution.

■ We turn now to the question as to whether or not any statute makes provision for the trial of the issue of necessity by a jury. We have seen that the assessment of damages may be a proper subject for jury determination if a statute so declares. ORS 35.090, 35.100, 35.110 and 35.140 are the only sections of our eminent domain procedure acts which employ the word "jury." ORS 35.090 says

"If motion is made before the formation of a jury, the court, upon the request of either party, shall order a view of the lands * * *."

ORS 35.100 appears to state the function which the jury serves in those proceedings. It says:

"Upon the assessment of the damages by the jury, the court shall give judgment condemning the land, right or easement in question to the plaintiff * * *."

ORS 35.110 provides that the defendant shall recover costs, disbursements and an attorney fee unless the plaintiff tendered to the defendant an amount equal to or greater than "that assessed by the jury." ORS

35.140 says that if a judgment is reversed and upon new trial "the jury assesses the damages of the defendant at a greater sum than before," the court shall "in addition to the judgment condemning the land * * * give judgment in favor of the defendant for such excess." It will be noticed that those statutory provisions associate the term "jury" only with the assessment of damages. Our past decisions, as is evident from their mention in previous paragraphs, have held that the aforementioned sections of our laws go no further than to empower the jury to assess the damages. We remain satisfied with those decisions and are aware of no enactment which authorizes the jury to resolve the issue of necessity. Good reason justifies legislation which assigns the issue of necessity to the judge. *Louisville & N. R. Co. v. Western Union Telegraph Co.*, 249 F 385, declared that the conflicting forces that present themselves for analysis upon an issue of necessity

> "* * * require a flexibility of judgment and an adjustment of alternatives not peculiarly within the function of a jury as that function is fixed either by theory or by precedent. They approximate at least as closely, and perhaps more nearly, the customary powers of a court of equity. * * *"

We are aware of no provision of our constitution and of no statute which requires that the issue of necessity must be resolved by the jury when a private party is the condemnor. But before coming to a final conclusion we will take note of the practice in our neighboring state of Washington which authorizes a private party to condemn a right of way for a logging road. The Washington Constitution (Art I, § 16) provides:

> "Private property shall not be taken for private use, except for private ways of necessity, and for

drains, flumes or ditches on or across the lands of others for agricultural, domestic or sanitary purposes. * * *"

The Washington statute (R.R.S. 936-1) which is employed in the condemnation of rights of way for logging roads reads:

"An owner or one entitled to the beneficial use, of land which is so situate with respect to the land of another that it is necessary for its proper use and enjoyment to have and maintain a private way of necessity or to construct and maintain any drain, flume or ditch, on, across, over or through the land of such other, for agricultural, domestic or sanitary purposes, may condemn and take lands of such other sufficient in area for the construction and maintenance of such private way of necessity, or for the construction and maintenance of such drain, flume or ditch, as the case may be. The term 'private way of necessity,' * * * shall mean and include a right of way on, across, over or through the land of another for means of ingress and egress, and the construction and maintenance thereon of roads, logging roads, flumes * * *."

In proceedings under the act, the judge, and not the jury, determines the issue of necessity. Seemingly, no contention to the contrary has ever been submitted to the courts. Some of the Washington cases are: *Dreger v. Sullivan*, 46 Wash2d 36, 278 P2d 647; *State ex rel. St. Paul and Tacoma Lumber Co. v. Dawson*, 25 Wash2d 499, 171 P2d 189; *State ex rel. Polson Logging Co. v. Superior Court for Grays Harbor County*, 11 Wash2d 545, 119 P2d 694; *State ex rel. Wheeler v. Superior Court for King County*, 154 Wash 117, 281 P 7; *State ex rel. Stephens v. Superior Court for Snohomish County*, 111 Wash 205, 190 P 234; *State ex rel. Carlson v. Superior Court for Kitsap County*, 107 Wash 228, 181 P 689; *State ex rel. Postal Tele-*

*graph-Cable Co. v. Superior Court for Grant County,* 64 Wash 189, 116 P 855. See, also, *McCarthy v. Bloedel Donovan Lumber Mills,* 39 F2d 34, cert den 282 US 840, 51 S Ct 21, 75 L ed 746 [governed by the Washington act just mentioned]. The decision last mentioned, after citing the Washington statute, said:

> "* * * Under the law, admittedly it may take only such a right of way as is 'necessary,' and the question of necessity is one for the court, to be determined in the light of all the facts. * * *"

In *State ex rel. Postal Telegraph-Cable Co. v. Superior Court of Grant County,* (above cited) the court said:

> "We believe that the correct construction of this statute is * * * that it invests the court with the power to determine whether specific land proposed to be taken is necessary in view of the general location, and to finally determine the question of necessity for the taking of such specific land * * *."

The defendant contends, as we have seen, that Art I, § 17, Constitution of Oregon, demands that the issue of necessity should be resolved by the jury whenever a private party seeks to expropriate a right of way for a logging road. If Art I, § 17, is applicable in a case of that kind, we are aware of no reason why it should not also govern if the state or one of its agencies is the condemnor. The identity of the latter is not relevant to Art I, § 17. The defendant does not argue that the state cannot delegate the power of eminent domain to a concern such as the plaintiff. We have seen that eminent domain proceedings are not within the range of cases reached by Art I, § 17, and, accordingly, nothing of consequence turns upon the question as to whether the plaintiff or a private party is the condemnor, provided that "a public use" is the object of the proceeding.

■ Without resorting to further analysis, we express our conclusion that neither Art I, § 17, nor amended Art VII, § 3, requires that the issue of necessity should be resolved by a jury. Likewise, we are aware of no statute which directs that the issue should be submitted to the jury. The fourth assignment of error is without merit.

The first assignment of error, as we have seen, contends that the trial judge erred when he found that the appropriation by the plaintiff of the two rights of way was based upon necessity.

We have quoted Art I, § 18, and ORS 376.510. After the defendant's brief sets forth a review of the history of those two measures it contends that they authorize condemnation for the right of way of a logging road only if "the timber owner was 'bottled up' and had no other access for removal of logs to market." According to the defendant, the necessity must be "indispensable in the sense that there is no other way out or that the cost of removal by any other way would be prohibitive * * *." He claims that in this case the plaintiff's evidence proves nothing more than that "the proposed private logging road might have been more 'convenient' or more 'feasible.' "

We are aware of no words in Art I, § 18, that are ambiguous with the exception of the word "necessary." ORS 376.510 which is the legislature's implement for the administration of Art I, § 18, uses the term "reasonably necessary." The latter is frequently employed in eminent domain proceedings and seemingly the courts have experienced no difficulty in determining its meaning; see 28 Words and Phrases, permanent edition, p 226. The word "necessary" as it appears in Art I, § 18, means "reasonably necessary," so the plaintiff says. In the present case the plaintiff's purpose

cannot be served, according to the defendant, unless the word "necessary" is construed to mean "convenient." He argues that it cannot be given that meaning and, as we have seen, insists that in the present instance "necessary" signifies "indispensable" or "imperative." Webster's New International Dictionary, second edition, gives this meaning of "necessary":

> "Essential to a desirable or projected end or condition; not to be dispensed with without loss, damage, inefficiency, or the like; as a necessary tool * * *."

Words and Phrases, permanent edition, vol 28, p 226, indicates that in eminent domain proceedings "necessary" generally does not imply an absolute physical need nor a situation in which the property is indispensable to the condemnor. The volume shows that the word is frequently deemed tantamount to "reasonably necessary." A review of the decisions cited in the compilation indicates that the term "reasonably necessary" has confronted the courts with no serious problem of construction. Resort to the rules of statutory construction is never permitted to introduce ambiguity into language which is understandable.

Several words that are not synonyms for each other express the conception of need. The difference between them consists largely in the varying degrees of urgency that constitute the need or want suggested by the chosen word. "Needful" implies a want that is less pressing than when "necessary" is employed. "Requisite" denotes a want of greater urgency than "necessary." "Indispensable" manifests a need that is peremptory, such as that indicated by man's need for water, air and food.

We shall not herein review the numerous decisions from other courts upon which the defendant's brief

dwells in its efforts to establish that "necessary" means "indispensable." The constitutional or statutory provisions with which those cases were concerned were not the same as those which we are called upon to construe. As we have seen, the draftsmen of Art I, § 18, did not express the circumstances under which a right of way may be condemned by using a word such as "indispensable," "imperative" or any other word which denotes inexorable urgency. Nor did they select a word suggesting a low degree of need such as "needful" or "required." Seemingly they were thinking of a situation in which the need for the right of way could be expressed by a term such as "reasonable necessity." At any rate, when the legislature translated the constitutional provision into a workable statute it expressed the need through the term "reasonably necessary."

The word "necessary" appears twice in Art I, § 18. It is our duty to determine the degree of urgency which it denotes. In seeking the answer we are justified in recognizing that the disputed word appears in such an important document as the state's constitution. The word was placed there by amendment in order to confer a right that this court had held was not available without constitutional change. The right is, therefore, one which the people deemed important and thought should be available when necessity called for it. As expressed in the constitution, logging roads that are necessary promote "the development and welfare of the state" and constitute "a public use." Such being the constitution's point of view, it seems reasonable to infer that the people who voted for the amendment did not view logging roads as facilities which serve only the convenience of a logger. If the word "necessary" appeared in the constitutional amendment only at the place where it is first found, its meaning might

be difficult to ascertain. But it appears a second time. In its second appearance it says that "the use of all roads * * * necessary to promote the transportation of" logs "is necessary to the development and welfare of the state." The second appearance of the disputed word gives an inkling as to its meaning.

■ All trees eventually reach maturity and unless then logged deteriorate. In order to bring their logs to the market and thus convert them into money, a road must be acquired. A stand of timber may be separated from the market by a tract of land over which the owner refuses to grant a right of way. If the stand of timber must remain uncut because a right of way cannot be had, a part of Oregon's greatest natural resource will be wasted. It may be that the stand of timber can be reached by an existing road which, however, requires a costly haul. The logger and the saw mill operator, like all others who are engaged in commercial transactions, accept as the test of feasibility the promise of the contemplated venture to earn a profit. We have no reason to infer that the people in amending Art I, § 18, and in thereby authorizing private individuals to acquire rights of way, did not have that test in mind. When the authors of ORS 376.510 inserted in front of "necessary" the qualifying word "reasonably" they no doubt expected that it would have the same effect upon "necessary" as the adjective "reasonable" has when it appears in combination with such words as "man," "care," "rate," "safety" and "price."

We believe that the term "reasonably necessary" requires the consideration of all pertinent factors. We shall not endeavor to enumerate them. One of them in a situation such as this one is the existence of an alternate route. The judicial function does not cease, however, when it finds that an alternate road exists.

When an individual finds himself landlocked by the property of his grantor, in situations akin to those depicted in *Rose v. Denn*, 188 Or 1, 212 P2d 1077, 213 P2d 810, and *Van Natta v. Nys*, 203 Or 204, 278 P2d 163, 279 P2d 657, and seeks a way of necessity, his efforts to break through rest upon legal principles different from those that control this case. In cases of the kind now before us the judicial function does not cease when it finds that an alternate road somewhere exists. It must go on and determine whether the alternate road is suitable and will enable the logs to reach market without unreasonable delay, expense, effort and hazard.

■ It is our belief that the word "necessary," as used in Art I, § 18, means "reasonably necessary" as that term is employed in ORS 376.510. We further believe that the meaning of the term "reasonably necessary" is indicated with sufficient clarity by its context.

Evidence which the trial judge could properly have deemed reliable indicates:

(1) The Sixes River road, unless materially improved could not serve the plaintiff's purposes, and the record contains no indication as to whether the county will improve the road or authorize a user to do so.

(2) The Sixes River route, even if improved, is 8½ miles longer than the Willow Creek road, thereby requiring the use of more trucks to bring the plaintiff's logs to Bandon and likewise demanding more time for the hauls.

(3) Use of the Willow Creek road is expected to effect a savings of $2 per thousand feet—an amount which is important.

(4) Since the public will not have access to the

Willow Creek road, safety will be promoted if the plaintiff uses it rather than the Sixes River road.

(5) The fact that the Willow Creek road is owned by the plaintiff enables the latter to control the speed of its vehicles and all other phases of operation.

(6) The Willow Creek road does not present the problems of slides, curves and drainage that are attendant upon the Sixes River road.

We think that the circuit court's findings, quoted in a preceding paragraph, are supported by substantial evidence.

■ Although we have set forth at length the evidence which bears upon the issue of "reasonably necessary," courts in eminent domain proceedings give to that issue limited review. The rule commonly employed is stated in this manner in *City of Eugene v. Johnson*, supra:

> "* * * And the determination of those matters by a grantee of the power of eminent domain is, in the absence of fraud, bad faith or abuse of discretion, final and not subject to review by the courts. * * *"

The selection by the plaintiff of the route for the two extensions of the Willow Creek road constituted a prima facie case of necessity for the easements. The evidence presented by the defendant could not establish lack of necessity, but only bad faith, oppression or abuse of power upon the plaintiff's part in the selection of the routes. We take the following from *State v. Superior Court for Grays Harbor County*, supra:

> "* * * The selection of the route by M. & D. Timber Company makes a prima facie case of necessity for taking such specific property, and in the absence of evidence of bad faith, oppression or abuse of power, evidence that another route is feasible is not enough to show that the selection of

the route sought by the condemnor shows such bad faith, oppression or abuse of power. In the absence of proof—there is none—of fraud, oppression or bad faith, the selection of the route by the logging company, as made in the case at bar by petitioner's board of directors, will be upheld. In State ex rel. Grays Harbor Logging Company v. Superior Court, 82 Wash. 503, 506, 144 P. 722, 724, we said:

" '* * * The evidence offered went no further than that route over the N. ½ of section 31 was feasible, and that the road could be constructed there at a reasonable cost. This fell short of meeting the requirements of the rule. In order to justify the court in ordering the change of location of the proposed road, it was necessary to show, not only another route which was practicable, and that the road could be constructed thereon at reasonable cost, but it was necessary to go further and show, by clear and convincing evidence, that, in the selection of the route sought to be condemned, there was bad faith, oppression, or an abuse of power. The evidence offered does not go to the extent of showing that the route selected by the condemnor causes unnecessary damage to the relators' property, and that the route over section 31 would cause much less damage to that property than would the route selected cause to the relators' property.'

"The general rule is that the condemnor has a right to select the route it desires to acquire for a right of way, with which selection the courts will not interfere except in case of a clear showing of bad faith on the part of the condemnor in making such selection."

The defendant's evidence does not disclose fraud, bad faith or abuse of discretion upon the plaintiff's part in the selection of the two projected extensions of the Willow Creek road. Since the trial judge's finding is supported by substantial evidence it must be given the effect of a verdict. We conclude that the first assignment of error lacks merit.

■ The second assignment of error contends that the circuit court erred when it denied the defendant's motion to make more definite and certain an averment of each complaint which reads, "Said easement is reasonably necessary for such purpose." The third assignment of error claims that the court erred in overruling defendant's demurrer to the complaints which contended that the pleadings did not state facts sufficient to constitute a cause of action. The complaints allege, "Said easement is reasonably necessary for such purpose." Each complaint described the plaintiff's timberland and gave the location of its mills. Each alleged the need of an easement of a right of way for a logging road across the defendant's land. Specifically the complaints averred:

> "* * * plaintiff requires an easement of a right of way for a logging truck road, road or way over and across certain land situated in Curry County, Oregon, and described on Exhibit 1 attached hereto * * *."

The complaints averred that the desired road would be used to transport the logs to the plaintiff's mills. We quote the following from *Oregon Mesabi Corporation v. C. D. Johnson Lumber Corporation*, supra:

> "Nor is there merit in Mesabi's contention that the complaint should show the evidentiary facts why the land sought is 'reasonably necessary' for the road. The statement that the land is 'reasonably necessary' for the road is an allegation of ultimate fact and we agree with Judge Cavanah's decision in Flora Logging Co. v. Boeing, D.C., D.Or., 1930, 43 F.2d 145, 148, that the allegation is sufficient. Cf. Dallas v. Hallock, 44 Or. 246, 252, 75 P. 204, and Sullivan v. Cline, 33 Or. 260, 54 P. 154."

The averment "necessary in order to properly remove the logs" was held a sufficient charge of necessity

in *State ex rel St. Paul & Tacoma Lumber Co. v. Dawson*, supra. See to similar effect *Linggi v. Garovotti*, 45 Cal2d 20, 286 P2d 15, where the easement was sought for the laying of a sewer pipe. We think that the demurrer was properly overruled and are aware of no reason why the motion should have been allowed. The second and third assignments of error lack merit.

■ The fifth assignment of error contends that the trial judge erred when he overruled a motion of the defendant to strike from the record a two page cost study prepared by the aforementioned O. S. Valentine, plaintiff's office manager. The cost study purported to show that if 100,000,000 feet is removed from the 5500-acre tract by the Willow Creek road, the expense will be $226,000 to $240,000 less than if the Sixes River road was employed. The paper accepted "the center of section 26" in computing the length of the haul to Bandon by either route. After Valentine had stated that he gathered the data which he employed for his cost study from records in his office the paper was received in evidence. Upon cross examination Valentine answered that he was not qualified to determine whether the center of section 26 was "the focal point" of the haul for the entire 100,000,000 feet. In his computations he assumed that the log trucks would run at a speed of 18 miles per hour upon the Willow Creek road and 12 miles per hour on the Sixes River road. He stated on cross examination that he secured those estimated speeds by "consultation with men that are in the woods or truck foremen." The motion to strike the exhibit argued that it was based in part upon "hearsay * * * opinion given to him by somebody else as to the proper points to use for the purpose of this study * * * and also as to truck speeds."

Valentine's cost study served only the non-jury

issue as to whether there was reasonable necessity for the road extensions and was intended to indicate that the plaintiff acted in good faith and had reasonable grounds for instituting the condemnation proceedings.

Obviously, in making his computations, Valentine was forced to accept some single point as the beginning of the haul from the tract to Bandon or ascertain the many places where the trucks would be loaded and then compute distances from those places. He used as the beginning point the center of section 26. The record contains excellent maps, unchallenged as to accuracy, which bear representations in clear outline of all pertinent features such as (a) the 5500-acre tract, (b) the Willow Creek and Sixes River roads, (c) the two desired extensions, (d) highway No. 101, (e) the city of Bandon and (f) the four access roads (Plum Tree, Elephant Rock, etc.). A glance at the maps enables anyone to contrast the center of section 26 with the rest of the 5500-acre tract and thereby perceive the basis of Valentine's computation of distances. Valentine used the center of section 26 not as a representation by him that the trucks would load there but as an arbitrary point of start. We infer from the record that the places where the trucks will load if the extensions are constructed is dependent in part upon developments that will occur during logging. It seems clear that Valentine's resort to the center of section 26 as the loading point did not constitute an infringement upon the hearsay evidence rule. Valentine made no effort to estimate the speed with which log trucks could operate upon the roads in question. Based upon an assumption that they would travel 18 miles per hour on the Willow Creek road and 12 miles per hour on the Sixes River road, he portrayed the results in dollars and cents. His cost study introduced into the

record no evidence, hearsay or otherwise. It was nothing more than a computation which he made upon facts and figures which were before the court for its acceptance or rejection. Had the trial judge made a similar calculation he would have violated no rule of evidence or of judicial conduct. This assignment of error reveals no merit. *Roberts Distributing Company v. Kaye-Halbert Corp.*, 126 Cal App2d 664, 272 P2d 886.

The sixth assignment of error follows:

"The Court on examination of witness Roy Gibson erred in sustaining objection to the following question:

"Q: What was the figure that you arrived at as the cost of what I understand to be the necessary improvement of the existing road system for the Willow Creek Road extending to the ends of the existing roads on each right-of-way in order to make them, as I understand you to say, proper for all-weather use?"

The witness, Roy Gibson, was a logging engineer who at the request of the defendant had made a cost study showing the expense of bringing the logs from the 5500-acre tract to Bandon by both (a) the Willow Creek road and (b) the Sixes River road. The plaintiff objected to the quoted question on the ground:

"* * * when the condemnor has selected a route and he has proved that that route is feasible in his judgment, that the only issues then left for determination on the question of necessity are whether there has been fraud, bad faith or gross abuse of discretion."

The trial judge sustained the objection and thereupon defendant's counsel made an extensive offer of proof. He explained that the testimony of the witness was intended to show abuse of discretion upon the

plaintiff's part in selecting as necessary the extensions to the Willow Creek route. If we understand correctly the offer of proof, Gibson included among the expenses which he estimated extensive alterations and improvements to the Willow Creek route as well as to the Sixes River route. The offer of proof indicated that the former would be 31 miles in length from the 5500-acre tract to Bandon and the Sixes River route would be 26 miles between the two points. Believing that the costs of construction would be $15,000 per mile Gibson estimated that the Willow Creek road would require an outlay of $465,000 and the Sixes River road something less. We do not understand that the plaintiff contemplates any alteration to or improvement of the Willow Creek road. Based upon his calculations as well as the factors of adverse grade Gibson determined that it would cost $11.27 per thousand to haul the logs by way of the Willow Creek route and $10.71 by the Sixes River route. All of the tabulation sheets and maps used by the witness were submitted as part of the offer of proof and are before us. At the close of the witness's testimony and the offer of proof the trial judge ruled:

"I listened very carefully to the statement of Mr. Tongue as to his offer of proof as to what this witness would testify to and, in my opinion, it 'does not show fraud, bad faith or abuse of discretion. Let the offer be rejected."

At the conclusion of that ruling the defendant called as his next witness the aforementioned Norman W. Porteous whose testimony is mentioned in a preceding paragraph of this opinion. Although the plaintiff objected to questions which asked Porteous for his opinions as to the respective merits of the Willow Creek and Sixes River roads the objections were overruled. The objections were that the proffered testi-

mony "has nothing to do with bad faith, fraud or abuse of discretion." The ruling was, "I will consider his answers as to whether or not I think they show fraud, bad faith or abuse of discretion." Porteous testified that as a partial basis for his conclusions and opinions he accepted the computations of Gibson. Defendant's counsel so acknowledged in saying to the trial judge:

"* * * Those assumptions he was making were based on the material in the offer of proof for Mr. Gibson."

Thus Gibson's data and computations came before the trial judge although his opinions were excluded; the data, computations and maps formed part of the offer of proof. Porteous estimated that it would cost $11.56 per thousand feet to remove the logs by the Sixes River road and $11.58 if the Willow Creek road were employed.

The offer of proof did not disclose whether Gibson gave attention to the fact that the Willow Creek road is a private thoroughfare over which the plaintiff has control. Nor did it indicate Gibson's preference between the two roads if it developed that the county would neither improve the Sixes River road nor authorize a user to do so. Likewise, the offer of proof does not reveal Gibson's attitude upon the objections which the plaintiff made to the Sixes River and Plum Tree roads on account of the slides to which they are subject.

Gibson described his study as "a quick survey" and explained, "We spent two days in the woods and then a day or two on the maps, on the topography maps and so forth."

There is necessarily entrusted to those who possess the power of eminent domain a broad discretion in the selection of the property essential to the contem-

plated public use. If the proposed public use will be represented by a thoroughfare, those vested with the power of eminent domain must have broad discretion in the selection of the route. However, the owner whose land is under condemnation may always submit evidence showing fraud, bad faith or abuse of discretion. Frequently in cases of this kind the defendant offers evidence indicating that another route is available to the condemnor and that it will serve the latter's purposes better. Evidence of that kind is not admissible if it merely shows that another route is available and that it has attractive qualities. It must go on and establish abuse of discretion by indicating that the would-be condemnor's choice of the land under condemnation has no basis in reason and is without any economic justification. If any other rule were employed, the court, and not the condemnor, would make the intricate and difficult choice of route.

It is possible that Gibson's evidence, if received, would have questioned the plaintiff's conclusion that removal of the logs by the Willow Creek route would be more economical than if the Sixes River route was employed. But, the plaintiff did not rest its case upon that feature alone. It stressed the safety and other superior advantages of the private road. It dwelt upon the slides which had often impeded the movements of log trucks upon the Sixes River and Plum Tree roads.

█ In the absence of any evidence whatever showing that the county would improve the Sixes River road or authorize a user to do so, the rulings which sustained the plaintiff's objections to Gibson's testimony were clearly justified.

The seventh assignment of error submits, "The Court erred in dismissing defendant's plea in abatement."

Upon the property over which the plaintiff wishes to construct the two forks of the Willow Creek road a road existed when the proceedings were filed. December 16, 1954, the defendant, for a consideration, granted to a corporation entitled Kronenberg Logging Company the right to "use all presently existing logging roads and rights of way" and also any roads "hereafter constructed" upon those parcels of land. The two forks which the plaintiff wishes to build will cross or go partially along the right of way of the existing road. The defendant filed in each condemnation action a plea in abatement in which he alleged that the proposed condemnations would cause damage to the Kronenberg Logging Company "in that it would be deprived of its present unlimited right to the use of the aforesaid presently existing road * * * and would also be excluded from its present unlimited right to the use of all new roads constructed over said lands, including the use of the new road to be condemned and constructed by plaintiff * * *." Each of the two complaints in these proceedings, in seeking the easements for the plaintiff, suggested that the easements should be subject to the following rights in the defendant:

> "The right to cross and recross said right of way and to use the road constructed or to be constructed thereon for logging and grazing purposes as long as such use or uses do not unreasonably interfere with the use of said right of way by plaintiff, its successors and assigns."

The defendant does not contend that the plaintiff's omission to have made Kronenberg Logging Company a party prejudiced him, and Kronenberg Logging Company has not sought to intervene in these proceedings. The defendant has called our attention to no reason for believing that the judgment which he challenges would have been more favorable to him if Kronenberg

Logging Company had been made a party defendant. ORS 13.110 provides:

> "In actions or suits the court may determine any controversy between parties before it, when it can be done without prejudice to the rights of others, or by saving their rights; but when a complete determination of the controversy can not be had without the presence of other parties, the court shall cause them to be brought in."

*Gasaway v. City of Seattle*, 52 Wash 444, 100 P 991, held that in condemnation proceedings the omission of a proper party does not invalidate the proceedings as against those who were made parties. *Delfeld v. Tulsa*, 191 Okla 541, 131 P2d 754, 143 ALR 1032, says:

> "Furthermore, it is generally held that a failure to join one owner in a condemnation proceedings invalidates those proceedings only as to him, and one who is joined in a condemnation proceedings cannot complain that others having some interest in the land are not made parties. Nichols on Eminent Domain, Vol. 2, 2nd Ed., Section 338, page 937."

Jahr, Eminent Domain, § 216, ruled:

> "* * * by weight of authority, the parties who are before the court can have their rights adjudicated and the absence of parties does not generally invalidate the proceeding against those who are made parties. * * *"

From Lewis, Eminent Domain, 3rd edition, § 538, we take the following:

> "If a necessary party is omitted, the proceedings will be nugatory as to such party. But as a general rule such an omission does not vitiate the proceedings as to those who are parties, nor can the latter complain of such omission."

The same rule is stated by 29 C.J.S., Eminent Domain, § 238, p. 1210, in this passage:

> "By the weight of authority the failure to join all the persons interested as parties defendant will

not invalidate the proceedings as against such persons as were made parties, and they cannot complain of the nonjoinder, unless their rights or interests are affected thereby, * * *."

We do not believe that error is revealed by this assignment of error. An appropriate provision in the judgment can point out that the rights of the Kronenberg Logging Company are not affected by the outcome of these two condemnation proceedings.

The following is the eighth assignment of error:

"The Court erred in making the following finding of fact:

" 'That plaintiff and defendant prior to the commencement of this action were unable to agree as to the amount of compensation to be paid for the easement sought to be condemned in this action'."

ORS 376.510, which was adopted pursuant to the amendment of Art I, § 18, Constitution of Oregon and which grants to private parties the right to use the power of eminent domain in condemning rights of way for necessary logging roads, is quoted in a preceding paragraph of this opinion. It will be recalled that it says:

"* * * If such person * * * is unable to agree with the owners of the land * * * as to the amount of compensation to be paid therefore, such person * * * has the right to condemn * * *."

The defendant objects to the findings of the trial judge which declares that the parties have been unable to agree upon the amount of compensation payable for the easement. His contention is based primarily on the fact that the plaintiff's offer of $2,000 for each of the easements did not contain a reservation to the defendant of the use of the road as did the complaint, but only offered to permit the defendant to cross and

recross the road. The defendant argues that since there was no attempt to secure agreement on the same terms as those set forth in the complaint the statutory requirements for bringing the action had not been met. He cites the part of *City of Portland v. Kamm*, 132 Or 317, 285 P 236, which holds:

> "* * * Where either the constitution or a statute requires that an attempt to agree with the owner as to the price of the land must be made before instituting condemnation proceedings, the provision is not directory but mandatory and, unless complied with, the suit cannot be maintained. In such case, the inability to agree after an attempt so to do is made jurisdictional by the statute and must be both alleged and proved. * * *"

The defendant contends that the challenged judgment must be reversed and the proceeding dismissed.

As evidence of inability to agree the plaintiff (1) presented testimony of one of its officers that the parties attempted to agree and were unable to do so, (2) introduced letters setting out the final offer of the plaintiff and (3) introduced a letter from defendant's counsel in answer to the offer in which it was stated: "Under these circumstances it would appear that no useful purpose would be served by a conference with you."

The letter last mentioned was dated December 20, 1956, and on the next day the board of directors of the plaintiff authorized the institution of these proceedings. The defendant calls attention to another resolution of that meeting of December 21, 1956, in which the officers were directed to "continue negotiations" and insists that the words just quoted constituted a recognition by the directors that "all hope of negotiations had not been exhausted." The defendant

argues that his refusal of the plaintiff's offer did not establish that he would not have been willing to have negotiated and to enter into an agreement which would have allowed him to use the prospective roads.

The plaintiff urges that defendant's contest of the right to condemn and likewise its contest of the amount of just compensation is a waiver of any objections to the plaintiff's failure, if any, to have attempted to negotiate. The defendant's answer not only denied the averments of the complaint that the rights of way which the plaintiff sought were reasonably necessary but also alleged affirmatively that they were

> "* * * neither necessary nor reasonably necessary for the transportation of logs * * * and the condemnation of said lands for a logging road would be unreasonably oppressive, burdensome and arbitrary * * * and if O.R.S. 376.510—540 are construed to authorize and permit the condemnation * * * then and in such event * * * said statute would be unconstitutional * * *."

In support of its contention that the defendant's contest of the action constitutes a waiver of his objection to plaintiff's failure, if any, to have negotiated, the plaintiff cites the annotation in 8 ALR 472 and the decisions therein cited. The plaintiff particularly mentions *State ex rel Wilson v. Superior Court of Chehalis County*, 47 Wash 397, 92 P 269, where the court stated:

> "* * * when a defendant in a condemnation proceeding takes the position that the petitioner has no right to condemn, the question of inability to agree as to compensation thereafter becomes immaterial. * * *"

The Illinois decisions cited in the annotation are instructive. The rule developed in them was summarized in *Chicago N. S. and M. R. R. Co. v. Chicago Title and*

*Trust Co.*, 328 Ill 610, 160 NE 226, by a holding that a judgment will not be reversed because direct testimony was not offered as to inability to agree if "it is evident from the contest and the acts of the parties that the parties cannot agree as to the compensation to be paid for the land," and that where a cross-petition is filed asking for damages and a contest on the merits, "this is a waiver of any question of an effort to agree on compensation before filing a petition." See *Alton and S. R. v. Vandalia R. Co.*, 271 Ill 558, 111 NE 531, and *Ward v. Minnesota and N. W. R. Co.*, 119 Ill 287, 10 NE 365. The essence of these and similar cases is that where the parties are obviously in dispute about the fact of condemnation or the validity of the rights sought it would be futile to require additional proof of the dispute.

While the cases just reviewed do not seem directly applicable in Oregon due to the language of the Kamm case, supra, (in which the plaintiff had not alleged a failure to agree since it was not operating under a statute requiring such an attempt as a condition precedent to bringing a proceeding) their reasoning commends itself and should have weight in our consideration of the problem. For instance, if we dismiss this case on the ground that no proper attempt was made to reach an agreement, we would do so in order to enable the parties to begin again negotiations about a right of way over the defendant's land. Aside from the fact that the defendant does not say that he would be willing to participate in negotiations for an easement even if it reserved to him a right to use the road, we think it is reasonable to assume that he would demand compensation in the sum of approximately $70,000 which is the amount demanded in his answer. When we compare this sum with the offer of the plaintiff to pay

$4,000 for the use of the land and the jury's finding of $5,000, it is hard for us to believe that there is any chance that the parties could reach an agreement outside of court.

■ The statute does not require that "all hope of negotiations" is exhausted before a suit may be brought. The obvious purpose of the requirement for negotiations is to insure that legal action is not too precipitous and that the parties have made some effort in good faith to reach an agreement. In the face of the refusal of the defendant of the plaintiff's offer and the statement that a further conference would serve "no useful purpose" we fail to see any reason why the plaintiff should be required to wait longer before bringing suit. The statute certainly does not require negotiations ad infinitum, and the uncontradicted proof shows that there had been an attempt to agree and a rejection of the attempt. The verdict of the jury indicates that such offer was certainly not an unreasonable one and that the plaintiff is not subject to a charge of "bad faith."

Further, *State Highway Commission v. Efem Warehouse Company*, 207 Or 237, 295 P2d 1101, indicates that the defendant is foreclosed from arguing that he might have accepted other terms. ORS 81.020 provides:

"The person to whom a tender is made shall at that time specify any objection he may have to the money, instrument or property or he shall be deemed to have waived it; and if the objection is to the amount of money, the terms of the instrument or the amount or kind of property, he must specify the amount, terms or kind which he requires or be precluded from objecting afterwards."

In the Efem case the issue was whether an offer in a condemnation case of $4,800 which was unaccepted by the defendant precluded it from recovering attorneys

fees when the jury award was less than the amount of the offer. The defendant argued that since the offer imposed a condition requiring a warranty deed, the defendant was not obliged to accept the offer since the Highway Commission, according to the defendant, had no right to demand a warranty deed. The court held that under ORS 81.020, even if the condition had been improper, the defendant had waived the issue by not objecting to the condition when the offer was made. In the case at bar the defendant attempts to distinguish the Efem case on the ground that a condemnor has the right to impose any condition he sees fit. But we fail to see how this contention, if accurate, has any bearing upon the matter. In each case the party is attempting to assign as the ground for his refusal to agree something which was not mentioned in the refusal of the offer. The purpose of ORS 81.020 is, of course, to demand that the parties set out their grounds of difference with clarity so that thereby the issues between them will narrow and they may be brought to an amenable settlement.

Even absent the statute we should not allow the defendant to raise at this point a ground which was not pointed out to the plaintiff before the latter commenced the suit, particularly in view of the fact that the plaintiff was apparently ready and willing to grant the defendant's wishes in this respect if only a price could be agreed upon. That it could not be agreed upon is abundantly clear, and the trial judge was justified in holding that a reasonable attempt had been made and had failed. We find this assignment of error without merit.

The ninth assignment of error reads:
"The Court on cross examination of witness Keith Foster erred in failing to sustain an objection

to a question requiring him to testify as to the price paid by the defendant for an undefined tract of 1,000 acres, the grantor being a family corporation wholly-owned by the defendant and his two brothers."

The tenth assignment of error follows:

"The Court on cross examination of witness Keith Foster erred in failing to sustain an objection to a question requiring him to testify as to the price paid by the defendant and his two brothers for land in Section 22 purchased in 1950."

We think that the two assignments of error can be considered together. According to Keith Foster, who is named in the two assignments of error, the 1000-acre tract was crossed by the rights of way which the plaintiff seeks.

The defendant's objection to the question which constitutes the subject matter of assignment of error No. 9 is:

"I object to that, the consideration. It was in the family, to begin with, and, besides, it isn't a question of what was paid for these lands; it is a question of what they are worth before and after the taking—not what they paid for them."

Defendant's (appellant's) brief says:

"* * * the rule has been established in Oregon and elsewhere that evidence of the price paid by the present owner for property now sought to be condemned is admissible as evidence if it will assist the jury in ascertaining the present market value of the property. * * *"

The defendant's statement is justified by *Douglas County v. Meyers*, 201 Or 59, 268 P2d 625, and *Fidelity Security Corporation v. Brugman*, 137 Or 38, 1 P2d 131. Thus, the only part of the voiced objection which remains submits the contention, "It was in the

family." The evidence indicates that December 6, 1955, Foster Brothers Logging Co., a corporation whose stock was owned by the defendant and his two brothers, conveyed the 1,000-acre tract to the defendant for a consideration of $10,000. When the challenged question was asked there was nothing before the court, except possibly the family relationship, to make it appear that the transaction was other than a normal business transaction. The objection made by the defendant possibly had a bearing upon the question as to whether the consideration paid ($10,000) represented the true value of the property, but it did not deprive the answer of admissibility.

The question which is the subject matter of assignment of error No. 10 reads as follows:

"Q. Now, turning to this property which is crossed by this other right-of-way in Section 22, when did Wayne Foster and you brothers acquire that land?

"A. In 1950.

"Q. What was paid for that?

"MR. WALSH: I object to the same question.

"COURT: I have been through that time and again. Same ruling; he may answer.

"A. We paid $6500 for it.

"Q. How many acres?

"A. 1000—little over 1000 acres."

It is seen from the above that defendant's counsel did not mention any ground of objection. Defendant now argues that the purchase which he made in 1950 was "remote in point of time" from the condemnation proceedings and that, therefore, error was committed by the challenged ruling. December 6, 1956, the plaintiff made its written offer to pay $2,000 for each of the desired easements. December 26, 1956, the two

condemnation proceedings were filed. The trial commenced May 6, 1957. When the trial judge made the challenged ruling there was nothing before him indicating that the price paid in 1950 did not continue to reflect true cash value. At any rate, the defendant made no claim at that time that values had changed.

We find no merit in assignments of error nine and ten.

■ The eleventh assignment of error urges that the trial judge erroneously sustained the plaintiff's objection to a question propounded by defendant's counsel to Roy Gibson which asked him for his estimate of the cost of constructing the two roads which were then upon the land over which the plaintiff sought the rights of way. We mentioned the two roads in a preceding paragraph. One of them was upon the tract when the defendant acquired it in 1950. The other was built by the plaintiff in 1956 as an adjunct to its logging of some of the defendant's timber which it had purchased. After Gibson had testified that he had estimated the cost of constructing the two roads he was asked, "Will you give us that opinion?" At that point the plaintiff objected, "it has nothing to do with market value," and cited *State Highway Commission v. Holt*, 209 Or 697, 308 P2d 181. The objection was sustained. No offer of proof was made. In the absence of an offer of the answer which the witness would have given, this assignment of error calls for no reversal. *Schweiger v. Solbeck*, 191 Or 454, 230 P2d 195, and *O'Brien v. Dunigan*, 187 Or 227, 210 P2d 567.

■ The twelfth and thirteenth assignments of error charge that the trial judge erroneously failed to give to the jury two requested instructions which respectively underlie those assignments of error. One of

the requested instructions had as its subject matter the fencing that may be needed after the roads are built. It states in part:

> "You are instructed * * * you may consider the necessity, if any, of the cost of the construction of fences, gates or wing fences along the boundaries of the lands taken by the plaintiff * * *."

The other requested instruction, if given, would have told the jury that the defendant was entitled to put his land to the best and highest use, and that the jury should consider that right in the lessening of values resulting from the action of the plaintiff in taking some of the tract.

The defendant's brief does not call attention to any evidence which discloses the cost of constructing any needed fences or gates. We have read the transcript of testimony with care but found nothing to which the jury could have turned for help with the possible exception of one answer which, however, was stricken from the record by a ruling. The ruling was not contested and is not assigned on appeal as erroneous. The trial judge instructed the jury upon the part which needed fencing plays in the award of damages in accord with *Pape v. Linn County*, 135 Or 430, 296 P 65. The defendant does not criticize that decision, but argues that the instruction given did not "state that in determining depreciation to the unappropriated lands of appellant, it was proper for the jury to take in consideration the cost of necessary fencing of those lands." We believe that the instructions in their entirety fully acquainted the jury with the applicable measure of damage.

■ The instruction which was given upon the subject of highest and best use of the land, in our opinion, complied faithfully with *State Highway Commission*

*v. Superbilt Manufacturing Co., Inc.,* 204 Or 393, 281 P2d 707, and *State of Oregon by State Highway Commission v. Burk,* 200 Or 211, 265 P2d 783. We believe that the instructions correctly gave to the jury all of the principles of law that were needed for a determination of the issues.

We have found no error. The judgment of the circuit court is affirmed; but if the parties desire to insert in the judgment a provision stating that the rights of the Kronenberg Logging Company are not affected, they may do so.

Affirmed.

McAllister, C.J., concurs in the result of this opinion.

## ON PETITION FOR REHEARING

William E. Walsh, Coos Bay, Hicks, Davis, Tongue & Dale, Portland, for petition.

Before PERRY,* Chief Justice, and ROSSMAN, LUSK, WARNER, McALLISTER** and SLOAN, Justices.

ROSSMAN, J.

A petition for rehearing accompanied by a brief has been filed in this case. The petition lists six grounds upon which it is based. One of them is the following:

> "The opinion would hold that a timber owner who already has and is using an existing means of access to his timber which is admittedly 'feasible' can claim that a 'necessity' exists justifying the condemnation of an additional means of access by a private logging road if, in his sole judgment, there would be any advantages in having a private logging road."

That statement, according to our belief, does not correctly reflect the facts of this case nor the result of our previous opinion. Neither the Sixes River road, which the defendant says the plaintiff should use,

---

* Chief Justice when the cause was argued.
** Chief Justice when this decision was rendered.

nor the Willow Creek road, which the plaintiff wishes to use, reaches the tract of 5,500 acres which the plaintiff plans to log. The nearest approach of the Sixes River road to the 5,500 acre tract is a mile or more from it. Testimony given by the defendant's own witnesses shows that if the plaintiff is required to use the Sixes River road it will be forced to build an access road a mile or more in length leading from that road to the nearest part of the 5,500 acre tract. A witness whose testimony upon the subject is not criticized stated that the construction of the road will cost $45,000. A belief is warranted that a single access road from the Sixes River road to the 5,500 acre tract will not suffice. The record does not disclose whether the plaintiff owns the land upon which the needed access road or roads would have to be built. According to the record, the plaintiff has never brought any logs from the 5,500 acre tract down the Sixes River road. Accordingly, the statement in the petition for rehearing that the plaintiff "has and is using an existing means of access" to its timber is not correct.

The statement which we quoted from the petition for rehearing refers to the Sixes River road as "feasible" for the plaintiff's intended purposes. The defendant's witnesses conceded that the Sixes River road is incapable of accommodating, in addition to its present traffic, the plaintiff's one hundred log trucks per day which it will employ to carry the logs from the 5,500 acre tract to its mill. The road was not designed to handle traffic of that volume. It is narrow and incapable of accommodating, except at occasional passing places, traffic moving in opposite directions. It cannot serve its present volume together with the plaintiff's trucks unless improvements are made to it.

The defendant's witness, Norman W. Porteous, in testimony which our previous opinion quoted, answered "no" to a question which asked him whether he believed that the Sixes River road was a practical and feasible thoroughfare for the removal of the timber from the 5,500 acre tract if it was not improved.

Another of the six bases for the defendant's petition for rehearing follows:

> "The opinion incorrectly holds that if existing public roads must be improved to be 'suitable' for hauling an increased volume of logs there is a sufficient 'necessity' to condemn private lands for private logging roads unless the landowner can prove that the public officials will perform their duty to provide adequate public roads, whereas the Court cannot properly assume that public officials will not do their duty and the burden in such a case should be on the logging company to prove that the public roads cannot and will not be made 'suitable' for hauling an increased volume of logs before private lands can properly be taken for private logging roads."

We pointed out in our previous decision that school buses and the automobiles of people who live along the Sixes River road use the latter. Loaded log trucks, as more than one witness declared, endanger other users of the thoroughfare. One witness mentioned an instance in which a log truck ran into the ditch adjacent to the road when it met a school bus. Obviously, county courts are required to perform their duties, and the law presumes that they will do so; but we are by no means certain that the local county court would order improvement of the Sixes River road for the accommodation of the plaintiff's log trucks when a short distance north of the Sixes River road there lies the Willow Creek road which is owned by the plaintiff

and was built for the trucks which will haul logs from the 5,500 acre tract to the mill. If those log trucks use the Willow Creek road they will not endanger the users of the Sixes River road, nor will they endanger any other person, for the Willow Creek road is a privately owned thoroughfare. ORS 376.330 and 376.335 do not render it mandatory for a county court to permit a user to improve a county road.

The defendant states, as another basis upon which the petition is predicated, the following:

> "In order to justify this result, and although admitting the word 'necessity' to be ambiguous, as used in the 1920 Constitutional Amendment, the opinion would completely ignore the legislative history of the amendment and is contrary to express representations made to the people in the 1920 Voters Pamphlet, stating the intended purpose of the amendment to be to provide for timber owners 'an opportunity to reach main lines of transportation' without being 'blocked' or 'bottled up'."

The defendant seems oblivious to the fact that the condemnation action under review was not instituted under the constitutional amendment (Art I, § 18) but under ORS 376.510 which was adopted pursuant to the constitutional amendment. As pointed out in our previous opinion, ORS 376.510 uses the term "reasonably necessary." It cited decisions of other courts which had experienced no difficulty in ascertaining the meaning of "reasonably necessary." The term has not been deemed ambiguous. The defendant makes no contention that ORS 376.510 is ambiguous or unconstitutional. Accordingly, there was little occasion to take note of the argument set forth in the Voters Pamphlet. "Reasonable Necessity" encompasses the language employed in the Voters Pamphlet. The argu-

ments advanced in the latter are not conclusive in his favor as the defendant seems to imply.

The other three bases for the petition for a rehearing are in part repetitions of contentions which we considered in preceding paragraphs or present matters to which we will give attention in the remaining portions of this opinion.

The brief in support of the petition for a rehearing imputes the following effect to our previous opinion:

"If you own a farm adjacent to a tract of timber, even though the owner of that tract has an existing means of access to it by a public road which he admits to be feasible, if he thinks that the condemnation of a private logging road would be somewhat cheaper and safer he can cut through the heart of your farm a high-speed logging road, as he pleases."

We do not believe that our previous opinion warrants that interpretation.

The amendment to Art I, § 18, Constitution of Oregon, and the legislation enacted pursuant to it were not intended to make it easy for one person to appropriate the property of another. Certainly ORS 376.-510 was not designed to authorize the would be condemnor to do "as he pleases." Eminent domain is not a favorite of the law, and its exercise is subject to judicial scrutiny. One who wishes to take a part of another's land so as to acquire the right of way for the transportation of logs may have to file, according to ORS 376.505, a map showing the proposed route and also an undertaking for the benefit of those whose property he wishes to appropriate. Property cannot be taken unless the would be condemnor has negotiated in good faith with the owner of the land upon the

subject of compensation. If the negotiations upon that subject fail, the would be condemnor may file an eminent domain proceeding. In it he must establish that the taking is "reasonably necessary * * * to promote the transportation of logs."

■■ In this case, the distinction between proving the "necessity" of condemnation and proving that the "selection of the route" was proper is complicated by these facts: In showing "necessity" the plaintiff endeavored to establish that the only other route available to it was inadequate in the sense that it "bottled up" its operations. In showing an abuse of discretion, the defendant contended that the Sixes River road offered a better way out and therefore the choice of the plaintiff involved such an abuse. In other words, both issues were focused on one of the possible outlets of the plaintiff. However, the defendant argues that the evidence he presented on the comparison of the routes was directed to "the question of whether there was necessity to condemn any route, in view of the existence of another available route." As we have previously pointed out, there was no other available route in existence, but only a possible route. Once the plaintiff had shown that it was "bottled up" because an apparent way was not practically available to it, it had made out a prima facie case of "necessity" and it was for the trial judge to say whether or not it had sustained its burden of proof, that is, of persuasion.

■ The issue of reasonable necessity is subject to the close scrutiny of the courts in cases which do not present a clear case of "bottling up" such as the present one. However, once it is shown that there is such "necessity" it is incumbent upon the defendant to

show that the chosen route is actually the result of fraud, bad faith, or abuse of discretion. It is in the exercise of the trial judge's discretion in this latter phase of the case that that judicial officer will not generally undertake to interfere with the condemnor's engineering judgment in the selection of the route but may properly take note of the fact, if such is the truth, that the proposed road will "cut through the heart of your farm." The words which we just quoted were taken from the excerpt of the defendant's brief which is copied above. If the "cut through the heart of your farm" is shown by evidence to be due to fraud, bad faith or abuse of discretion the condemnation proceeding will fail. In short, the courts are empowered to analyze all evidence, including that introduced by the plaintiff in making out his case of "necessity," which tends to show that the taking is the result of fraud, bad faith or will constitute an abuse of discretion.

■ The present case does not represent an effort by the plaintiff to "cut through the heart" of a farm. The land which the plaintiff seeks to take is in a mountainous area several miles distant from Highway 101 and is virtually devoid of timber. Photographs show that it is rocky in character; and a witness predicted that in a few years it will be brush land, unfit even for grazing. The defendant does not contend that the plaintiff is undertaking to deprive him of a choice tract of land, but argues that the plaintiff should use the Sixes River road. We believe that the trial judge committed no error when he rejected that argument.

The above disposes of all contentions offered by the petition for a rehearing that need consideration. The petition is denied.